TG

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROSENTHAL COLLINS GROUP, LLC, an Illinois Limited Liability Co., | ) | |
| Plaintiff/Counter-Defendant | ) | |
| vs. | ) | No. 05 C 4088 |
| TRADING TECHNOLOGIES INTERNATIONAL, INC., a Delaware corporation, | ) | |
| Defendant/Counterclaimant. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Rosenthal Collins Group, LLC ("RCG") brought suit against Trading Technologies International, Inc. ("TT"), asking for, among other relief, a declaratory judgment of patent invalidity and non-infringement. RCG filed its lawsuit after TT filed a number of suits against various other competitors, alleging infringement of U.S. Patent nos. 6,772,132 ('132 patent) and 6,766,304 ('304 patent). In an effort to simplify discovery and pre-trial motion practice, the cases were assigned to this court for all common issues. Thereafter, the parties engaged in vigorous discovery, much of which was centered on locating evidence of prior art, which defendants and RCG argue would invalidate TT's patents. During the discovery period, RCG filed a motion for summary judgment of invalidity, arguing that TT's patents were anticipated and thus invalidated by the Wit Capital digital stock market ("Wit DSM") prior art. In that summary judgment motion, RCG relied almost exclusively on the declaration of Walter D. Buist – the creator and developer of Wit DSM – and its attached exhibits. After a 15-hour deposition of Buist, TT brought this motion for sanctions. Essentially, TT argues that Buist, at the advice and with the assistance of RCG's counsel, materially altered the evidence on which he relied in developing his declaration, and therefore,

intentionally misled the court and TT. For the reasons set forth below, we grant, in part, TT's motion for sanctions. With regard to related motions, we deny RCG's motion to strike TT's letter brief, memorandum and reply, and deny RCG's motion directing TT to pay its fair share of costs associated with UBS' compliance with subpoenas.

## BACKGROUND

This court has rehashed the background of this set of cases on a number of occasions, and we decline to repeat it here. TT's patents relate to computer software used for electronic trading in the futures market. TT has made claims, both in public statements and within the course of this litigation, that its patented technology revolutionized the futures market and has been widely copied by competitors. Based on such allegations, TT filed a number of patent infringement suits and settled with a number of additional competitors. Because of its widespread allegations of copying, it is no surprise that TT's allegations have made quite a stir in the futures trading industry. Thus, invalidation of TT's patents, sought by RCG in its summary judgment motion, would have a widespread impact across the industry. The current motion for sanctions, which seeks to dismiss RCG's declaratory judgment claims and seeks to find validity of TT's patents, is therefore more consequential than many motions for sanctions arriving before this court.

RCG's motion for summary judgment relies primarily on Buist's declaration and its accompanying exhibits. In his declaration, Buist described two processes whereby a trader's single action[1] would execute a trade (TT's motion, exh. D, ¶¶47, 49). Simply put, Buist described two methods for placing an order via the Wit DSM system: (1) double-click + "send"; and (2) double-click + ENTER. TT collectively dubbed the processes as "double click

[1]TT asserts that even if Buist was accurately describing the single action order entry of Wit DSM as available in 1998 and 1999, such a system would not have anticipated TT's patents. We make no judgment on whether the single action order entry described by Buist would, in fact, be considered a single action order entry as described in TT's patents.

+" order entry techniques. As we find such a term appropriate, and it is not refuted by RCG, we adopt it.

Pointing to inconsistencies in Buist's declaration, and his subsequent deposition, TT argues that Buist modified the Wit DSM source code after the commencement of this litigation, and tried to pass it off as source code from 1998 and 1999. Specifically, TT asserts that Buist added the "double-click +" functionality. Thus, plaintiff's motion claims that RCG's motion for summary judgment of invalidity was filed in bad faith as it was based principally on Buist's declaration, which incorporated and referenced materially-altered evidence.

It is important to note that finding a single action order entry in the Wit DSM process would be material to a finding of prior art. Such is especially true since we previously found that defendant eSpeed was unable to discover prior art that combined both a ladder view and single click trading capabilities (see TT's motion, exh. A, at 2). In arriving at such a conclusion, we analyzed U.S. Patent No. 6,408,282 ('282 Patent), which was the patent associated with Walter Buist's digital stock market.[2] Thus, finding that the Wit DSM system did in fact combine both elements may well alter our conclusion with regard to validity.

DISCUSSION

District courts are given wide latitude in fashioning appropriate sanctions for inappropriate behavior. Johnson v. Kakvand, 192 F.3d 656, 661 (7th Cir.1999). The sanctions, however, should be proportionate to the offense, and default judgments – the sanction TT seeks in this case – should not be entered precipitately. Sims v. EGA Products, Inc., 475 F.3d 865, 868 (7th Cir.2007). Default judgment is appropriate where a lesser sanction under the circumstances would unfairly minimize the seriousness of the misconduct and fail to

[2]We note that RCG makes a concerted effort to distinguish the '282 patent from the Wit DSM, stating that "The Buist 282 patent is the only issued patent describing some of the features of the Wit DSM. That patent is distinct from the system of the Wit DSM, which is a separate piece of prior art" (RCG's response, at 2, n1).

sufficiently deter such misconduct by others in the future. REP MCR Realty, L.L.C. v. Lynch, 363 F.Supp.2d 984, 997-98 (N.D.Ill.2005) (cataloguing cases wherein a party's document fabrication and/or perjury resulted in dismissal or default judgment).

If TT's allegations are true, we are granted authority to sanction RCG and/or its counsel under either Federal Rule of Civil Procedure 37(b)(2) or the inherent power of the court. Lynch, 363 F.Supp.2d at 998.[3] Rule 37(b)(2) indicates that a party's failure to obey a discovery order entered by the court is subject to sanctions. And, although we never issued a direct order prohibiting reliance on false evidence, we have broad latitude to interpret what constitutes an order. Quela v. Payco-general American Creidtas, Inc., 2000 WL 656681, *6 (N.D.Ill.2000) ("Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable, we can properly consider the sanctions available under Rule 37") (internal citations omitted). Alternatively, we have authority to sanction a litigant for bad faith conduct under the inherent powers of the court. Diettrich v. Northwest Airlines, Inc., 168 F.3d 961, 964 (7th Cir.1999); Quela, 2000 WL 656681, at *6; Lynch, 363 F.Supp.2d at 998 (cataloguing cases). Such inherent powers "'are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Quela, 2000 WL 656681, at *6 (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)). An exercise of such powers, however, must be applied with caution. Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co., 2002

---

[3]Rule 11 also affords us the authority to sanction attorneys and parties. Rule 11(b) states: "By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,– (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;...(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery...." Based on its allegations, TT could have proceeded, at least with respect to RCG's counsel, under Rule 11. Because TT only cited to Rule 37, and because ultimately it will have no bearing on the outcome, we do not assess TT's claims under Rule 11.

WL 1433717, *9 (N.D.Ill.2002) (citing Corley v. Rosewood Care Ctr., Inc., 142 F.3d 1041, 1059 (7th Cir.1998)).

In order to impose such sanctions, we must find that RCG displayed willfulness, bad faith or fault. In re Thomas Consolidated Industries, Inc., 456 F.3d 719, 724 (7th Cir.2006). The burden to show such bad faith, by clear and convincing evidence, lies with the moving party. Lynch, 363 F.Supp.2d at 999. *See also* Fidelity Nat. Title Ins. Co. of New York, 2002 WL 1433717 at *6 ("The clear and convincing standard requires proof falling between standards of preponderance of the evidence and beyond a reasonable doubt") (citing Brown v. Bowen, 847 F.2d 342, 345-46 (7th Cir.1988)).

As noted above, plaintiff asserts that Buist, with the knowledge and guidance of RCG's counsel, fabricated evidence of the Wit DSM System from 1998 and 1999. Specifically, plaintiff argues that Buist's declaration – the heart and soul of RCG's summary judgment motion – was replete with error and misled the court as to the functionality of the Wit DSM System as it existed in 1998 and 1999. As support for its position, TT introduces Buist's deposition[4], arguing that the inconsistencies between the deposition and the declaration prove that "RCG knowingly filed a motion for summary judgment seeking to invalidate the patents-in-suit based on false and intentionally misleading testimony and materially altered evidence" (TT's motion, at 20).

TT makes serious allegations against Buist, RCG, and RCG's counsel. As "[o]ur legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts" (Quela, 2000 WL 656681, at *7), we recognize that false testimony "erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of

---

[4]TT submitted 18 video clips of Buist's deposition, along with one clip of Christopher Buist's deposition, in addition to providing the court with Buist's entire deposition and reciting the allegedly damning portions in its brief.

courts, and threatens the entire judicial system." *Id.* We also recognize that the parties are engaged in a multi-party, multi-million dollar lawsuit with significant financial risks and potential gains. While we take allegations of falsified evidence and perjured testimony very seriously, we will not deny RCG the opportunity to engage in the merits of their case unless TT's evidence is clear and convincing of RCG's bad faith and purposeful misrepresentation.

After carefully reviewing RCG's summary judgment motion, including Buist's declaration, against Buist's recent deposition testimony, we do not believe that "RCG took extraordinary steps to fabricate prior art in an attempt to permanently destroy TT's property rights in its patents," as asserted by TT (TT's motion, at 1). We do believe, however, that RCG's motion for summary judgment was somewhat misleading, could be deemed disingenuous, and at the very least was prematurely filed.

Many of TT's complaints regarding Buist's declaration can be discarded as semantics complaints. For example, in paragraph 52 of Buist's declaration – a paragraph given special attention at Buist's deposition – Buist states:

> Exhibit F attached to this declaration is a true and accurate photocopy of the Zip disks that I found when searching for information related to the Wit Capital DSM. Those disks contain copies of source code and related files that reflect the state of the Wit DSM at different times during late 1998 and early 1999. I personally installed source code for the 9811 and 9902 versions of the Wit DSM on a Dell Latitude D810 laptop. I also compiled source code that led to the videotaping of the desktop of the Dell Latitude D810 laptop while I ran the Wit DSM on it.

Because it is undisputed that RCG entered evidence in support of its summary judgment motion that contained source code that Buist had modified from the original code found on the zip disks,[5] TT argues that paragraph 52 is purposefully misleading. The exhibit

[5] *See, e.g.*, TT's motion, exh. E., at 489 ("Well, we could compare them and you would find – my guess is you would find 400,000 lines over here that are comparable to 400,000 lines over here and 15 that are different"). The dispute is whether or not the modified code presented to the court in RCG's summary judgment motion was an accurate representation of the Wit DSM technology in 1998 and 1999.

was, however, a photocopy of the surface of the disk, and not the code residing thereon, and was an exact photocopy of that surface. Additionally, the use of the words "compiled source code" could indicate that the code was not an exact replica of the code found on said disks. Similarly, in paragraph 29 of his declaration, Buist averred: "I used these source code modules to produce a demonstration of the state of the DSM client and market manager server components at that date." There is no avowal that the code was unchanged, just that Buist used the source code he found to create a representative demonstration (*see also* TT's motion, exh. D, at ¶ 31). Similarly, paragraph 45 states: "The files comprising the demonstrations of the November 1998 and February 1999 versions of the DSM are the result of my compiling copies of the original source code for the Digital Stock Market. I created the data files that drive the demonstration and the files that explain how to run the demonstration. Again, these demonstrations are, in all material respects, the same as the demonstrations that we presented to the market makers, clearing brokers, and brokerage houses in late 1998 and very early 1999 – including ADP." Buist again used the term "compiling," which does not necessarily indicate an exact copy. Additionally, the statement that the demonstrations are, "in all material respects," the same as 1998 and 1999 demonstrations, indicates that perhaps some things had been modified. Although we recognize TT's concern that RCG's motion was less than forthcoming with regard to Buist's modifications of the source code, we find that most of the statements in Buist's declaration were either vague or confusing, but not intentionally misleading.

We are troubled, however, by RCG's presentation that the single action entry of double click + ENTER was present in the Wit DSM system in 1998 and 1999. With respect to the Wit DSM product as it existed in November 1998, Buist's summary judgment declaration reads:

> To place an order on the Digital Stock Market, a trader single-clicked his mouse on the price associated with the security that he wanted to buy or sell. Single-

> clicking on the buy or sell piece caused the system to fill in fields of the order ticket on display. The trader could then change the volume desired, click the "verify" button and the verification screen would appear. The trader could then click on the "send" button to send the order to the electronic exchange. Double-clicking on the price would permit the trader to avoid filling in the volume because the system automatically set the order ticket volume to the order book volume of the price that was double-clicked and eliminated the verification screen. Then, the trader clicked the 'send' button and the system sent the order to the electronic exchange. As an even quicker alternative, a trader could double-click on a price associated with a particular volume and immediately hit the ENTER button, which would be highlighted, to enter the order. In each case, the system preset the parameters for the security, the type of account used and other parameters, including the price, for the trade.

(TT's motion, exh. D., at ¶ 47). Buist makes almost identical representations for the Wit DSM as it existed in February 1999 (*id.*, at ¶ 49). Buist's declaration clearly states that a trader could trade via a single action by either (1) a double-click plus clicking the send button, or (2) a double-click plus hitting the ENTER button. RCG's memorandum of law in support of its summary judgment motion further presses that point: "Wit DSM version 9811 also permitted a trader to select (e.g., by double clicking) a particular area of the order entry display region (e.g., a price cell) to set a number of other trade parameters (e.g., stock name, price and volume) and then click one other button (or simply hit the ENTER button on the keyboard) to send the trade order to the electronic exchange. Thus, the Wit DSM version 9811 met the fourth limitation of the independent claims of the 132 patent" (TT's motion, exh. C, at 7. *See also id.*, at 9).

Buist's deposition clarifies that the functions he represented to this court as existing in the Wit DSM system in 1998 and 1999 were as he remembered them in 1998 and 1999, not an exact replica of the code as it existed on the zip disks he discovered from those dates. Rather, some of the code was modified to get the system running on current computers and demonstrate the system as he remembered demonstrating it in those years. Buist's deposition, however, tells a different story with respect to the double-click + ENTER functionality. On

page 196, Buist confirmed the following: "The code that you actually found would not do the function where you double click on the price and bypass the order ticket and go right to the verification screen, correct?" Similarly, Buist affirmed the following: "So, the only place that you know of that this screen exists, this double click to bypass the order entry screen and go right to the verification screen, the only place that you know of that it exists is in the code you modified in 2005 and 2006, correct?" (TT's motion, exh. E, at 203). And unlike the double click + "send" functionality that Buist demonstrated in 1998 (*id.*, at 204), Buist did not personally know of the double-click + ENTER functionality until 2006 (*id.*, at 284). He testified that he did not write that piece of the code, so was not sure whether or not the double-click + ENTER functionality was designed to be part of the original system (*id.*, at 285-86). Nor did he know of any documents to substantiate that the double-click + ENTER functionality was an original function (*id.*, at 320).

Although RCG's response to TT's motion for sanctions introduces additional evidence allegedly corroborating the statements in Buist's summary judgment declaration, that evidence was not presented in the original summary judgment motion. For example, in his second declaration entered in opposition to TT's motion for sanctions, Buist indicates that his testimony was corroborated by documents authored by Charles Mauro and the source code archive in possession of third party UBS.[6] None of that evidence had been discovered when RCG filed its summary judgment motion. And the prosecution history included with RCG's opposition to TT's motion for sanctions had been omitted from its summary judgment motion as well. Either RCG had yet to discover such evidence, or it made a poor strategic decision to

[6]Discovery from third party UBS is the subject of a separate motion for costs addressed below. Such discovery was not produced until February or March of 2006, long after RCG filed its motion for summary judgment.

leave it out. Thus, we find that RCG's motion was either premature or underdeveloped.[7] We also note that had RCG been forthcoming, its summary judgment motion would have been doomed from the start. The motion's primary reliance on Buist's testimony, without corroborating evidence, would have been insufficient to prove invalidity by clear and convincing evidence. *See* Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354, 1366 (Fed.Cir. 1999).

So that brings us to remedy. Should RCG be sanctioned for its premature and less than forthcoming motion? TT encourages us to enter a default judgment against RCG. Although we have the authority to enter a default judgment in extreme circumstances (*see, e.g.*, Quela, 2000 WL 656681), we do not think this case presents such egregious conduct to warrant such a punitive remedy. Default judgment was an appropriate remedy in Quela, where the witness was coerced into falsely testifying. It was also an appropriate remedy in Lynch, where the defendant fabricated a number of documents and "the overall mix of evidence point[ed] in a synergistic way to a single conclusion." 363 F.Supp.2d at 1004. A "default judgment should be used only in extreme situations, or when other less drastic sanctions have proven unavailing." Sun v. Board of Trustees of University of IL, 473 F.3d 799, 811 (7th Cir.2007). And in this case, TT did not present clear and convincing evidence that Buist or RCG's counsel willfully and intentionally fabricated evidence to deceive this court or the judicial

---

[7]RCG and Buist continue to rely on the fact that they placed a computer software program on the declaration laptop, which when run, would set out the differences between the code originally found on the zip disks and the modified code presented to this court. We find reliance on such somewhat disconcerting. Although RCG offered this court and TT the opportunity to see the declaration machine, without a warning from TT we would have had no reason to think it necessary. Nowhere in RCG's motion does it indicate that any code had been changed, nor does the Buist declaration make such a statement. RCG's summary judgment motion does not specifically state what is on the laptop, much less mention the existence of or need to use the "differences software." While we do not find clear and convincing evidence that RCG intended to mislead this court, we find RCG's failure to make such a disclosure troubling. *See* Northwestern Nat. Ins. Co. v. Baltes, 15 F.3d 660, 662-63 (7th Cir.1994) ("District judges are not archaeologists. They need not excavate masses of papers in search of revealing tidbits – not only because the rules of procedure place the burden on the litigants, but also because their time is scarce").

system.

We do think, however, that RCG was somewhat disingenuous in filing its summary judgment motion. It neglected to inform this court of the differences in the original and modified codes. It offered the use of the declaration laptop without informing us that "differences software" was installed on that machine, or that there may be a need to run such software. It presented Wit DSM as having the double-click + ENTER functionality in 1998 and 1999, relying on Buist's declaration, when, in fact, Buist had no personal knowledge of such a function prior to 2005 or 2006. Because RCG filed its summary judgment motion without disclosing the modification of the source code, TT hired a software programming consultant to locate the modifications of the code. RCG should pay costs for that software programming consultant. RCG is also directed to pay costs and attorneys' fees associated with TT's motion for sanctions.

Further, RCG filed a subsequent motion for an order directing TT to pay its fair share of the costs associated with UBS' compliance with subpoenas. Those subpoenas are related to the Wit DSM prior art. Through UBS, RCG is seeking evidence and discovery that corroborates the testimony of Buist. As RCG filed a premature summary judgment motion alleging invalidity based on the Wit DSM prior art, it did not feel that it needed additional corroborating evidence. In the aftermath of Buist's deposition and TT's motion for sanctions, UBS is producing such documentation. The subpoenas were not executed until seven months after the entry of RCG's summary judgment motion and thus TT should not have to share in those costs. Although Rule 45(c)(2)(B) protects non-parties to litigation from "significant expense resulting from the inspection and copying commanded," in light of the analysis above, TT should not be required to share in those costs. We also strike Buist's declaration and deny RCG's motion for summary judgment of invalidity with leave to refile the motion supported

by proper evidence.

Finally, we deny RCG's and eSpeed's motion to strike TT's letter brief, memorandum and reply in support of its motion for sanctions. Although we have the power to strike redundant, immaterial, impertinent, or scandalous matter under Rule 12(f), such motions are generally not favored (*see* Circuit Systems, Inc. v. Mescalero Sales, Inc., 925 F.Supp. 546, 548 (N.D.Ill.1996)), and we decline to grant RCG's request in this case. Although TT may have stretched somewhat in its motion for sanctions, as the analysis above makes clear, we do not think it was totally out of line and therefore deny the motion to strike.

## CONCLUSION

For the reasons stated herein, we grant, in part, TT's motion for sanctions. RCG is ordered to pay costs for TT's software programming consultant and costs and attorneys' fee associated with this motion. Buist's summary judgment declaration will be stricken and RCG's motion for summary judgment is denied with leave to refile. RCG's motion for an order directing TT to pay costs is denied. RCG's motion to strike is denied.

James B. Moran
JAMES B. MORAN
Senior Judge, U. S. District Court

March 14, 2007.