**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ROSENTHAL COLLINS GROUP, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 05 C 4088 |
| TRADING TECHNOLOGIES INTERNATIONAL, INC., | ) | Judge Sharon Johnson Coleman |
| Defendant. | ) | Magistrate Judge Young B. Kim |
| TRADING TECHNOLOGIES INTERNATIONAL, INC., | ) | |
| Counterclaimant, | ) | |
| v. | ) | |
| ROSENTHAL COLLINS GROUP, LLC, | ) | |
| Counterclaim Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on defendant and counterclaimant, Trading Technologies International, Inc.'s motion for default judgment and monetary sanctions based on misconduct by plaintiff and counterclaim defendant, Rosenthal Collins Group, LLC, and its counsel [308]. This Court has reviewed the parties' submissions and heard oral argument on the motion on January 7, 2011. For the reasons that follow, the motion is granted.

# I. Background

The instant case is one of a several involving Trading Technologies International, Inc.'s ("TT") U.S. Patent Nos. 6,766,304 ("the '304 patent") and 6,772,132 ("the '132 patent") (collectively "the TT patents"). The patents relate to software developed by TT for use in the futures trading industry that allows traders to enter electronic orders. The primary features at issue in the various lawsuits are (i) a "static display of prices," and (ii) a "single action order entry." Plaintiff, Rosenthal Collins Group, LLC, ("RCG") filed this declaratory judgment action contending that the "double-click +" functionality of its software is a "single action" that invalidates the TT patents. TT filed corresponding counterclaims alleging patent infringement.

On April 26, 2006, RCG filed a motion for summary judgment claiming TT's patents were invalid as a matter of law because the Wit Capital Digital Stock Market software ("Wit DSM") anticipated TT's patents. RCG's motion asserted that software written in 1998-99 was prior art that invalidated TT's patent applications because it preceded the March 2, 1999, "critical date" for TT's patents. In support of its motion, RCG relied primarily on the declaration of RCG's retained consultant, Walter D. Buist, a computer programmer that developed the source code for the Wit DSM. RCG also supported its motion with an exhibit of removable computer "zip" disks alleged to contain a back-up copy Wit DSM source code originally written by Buist in 1998/1999. RCG claimed that the source code written by Buist at that time contained the features that TT sought to patent, and that Buist had found the exhibit disks in his barn.

Buist was deposed on June 23, 2006. During the deposition, Buist revealed that, contrary to RCG's summary judgment claims, the software code containing the functionality at issue in this case had not been written onto the exhibit disks in the 1998-99 period. Buist stated that the

code he found on the disks had not contained that functionality, and that he added it in December 2005. (Buist Dep. I, June 23, 2006, p. 197-198, Dkt. #306-8.)   Additionally, Buist made modifications that were required to permit the code to run on current operating systems. Id. Buist further testified that he sent Mr. Geoffrey Baker, counsel for RCG, a CD with a "differences" list that set forth the modifications to the source code.  Buist testified that he modified the source code labeled "9902" in a similar manner to add the "double-click +" functionality sometime in January 2006. (Buist Dep. I, June 23, 2006, p. 197-198, Dkt. #306-8.)

A.      *TT's First Motion for Default and Sanctions*

Based on Buist's revelation that he had modified the code to add the "double-click +" functionality, and the inconsistencies between his declaration for the summary judgment motion and his deposition testimony, on August 10, 2006, TT filed a motion for default judgment and monetary sanctions. (Dkt. # 90.)  Notwithstanding Buist's deposition testimony, on March 14, 2007, Judge James Moran found that TT had not presented "clear and convincing evidence that Buist or RCG's counsel willfully and intentionally fabricated evidence to deceive this court or the judicial system." (Dkt. # 142.)  However, Judge Moran found that "RCG's motion for summary judgment was somewhat misleading, could be deemed disingenuous, and at the very least was prematurely filed." Id.  Based on the evidence before the court at that time, Judge Moran found that "TT had not presented clear and convincing evidence that Buist or RCG's counsel had willfully and intentionally fabricated evidence to deceive this court or the judicial system." Id.  Although Judge Moran declined to enter a default judgment, he granted monetary sanctions, struck Buist's declaration, and struck the summary judgment motion with leave to

refile. The Court ordered RCG to pay costs for TT's software programming consultant and costs and attorneys' fees associated with the motion for sanctions.[1]

RCG filed a motion to vacate the sanctions, continuing to defend Buist and the authenticity of its evidence. In opposition to RCG's motion to vacate, TT voiced a suspicion it had had since Buist's first deposition, on June 23, 2006, that the "last modified" dates[2] on the zip disks had been altered. In reply, RCG argued that:

> "TT provides no evidentiary support for its Oliver-Stone-esque theory that Walter Buist, a disinterested non-party, literally turned back the clock on his computer (a computer that TT examined thoroughly on no fewer than three occasions). There is simply NO evidence to support its libelous charge against Mr. Buist. TT knows that any such attempts will fail because TT knows that the reason the source code files have a last modified date in the 1998 and 1999 time period is because the last time the zip prefix files were modified was in 1998 and 1999." (Dkt. # 204.)

Judge Moran denied RCG's motion to vacate the sanctions on July 17, 2007. In denying the motion, Judge Moran reiterated his prior ruling and emphasized that, while he did not dismiss the case as requested by TT, "throughout the opinion [the Court] labeled RCG's conduct as, alternatively, 'somewhat misleading,' 'disconcerting,' 'troubling,' 'less than forthcoming,' and a 'poor strategic decision.'" (Dkt. # 225.) Judge Moran when on to state, "Contrary to RCG's argument, we did not, nor do we now, believe that RCG's actions were merely mistakes or slight errors in judgment. At best, they were grossly negligent... Any attempt by the court to soften the tone of its disapproval should not be mistaken for leniency. RCG's actions were improper and we sanctioned it accordingly." Id.

---

[1] Judge Moran ordered the parties to brief the issue of fees and costs. On June 29, 2010, Magistrate Judge Young B. Kim entered an order awarding TT $289,234.39. This Court notes, however, that RCG has yet to pay any of those sanctions and has filed an objection to Magistrate Judge Kim's order. This Court will address that dispute in a separate order.

[2] A "last modified date," reflects the last time a file was changed in any way. (Klausner Decl., Dkt. # 306-15, at ¶ 5.)

After ruling on TT's first motion for sanctions, Judge Moran granted TT's request for further discovery. On March 27, 2007, TT filed its first motion to compel documents and equipment that it had requested following the deposition of Buist in June 2006, and also a second deposition of Buist. (Dkt. # 146.) In its May 16, 2007, order granting TT's first motion to compel, the Court noted that TT had waited nearly nine months for a response to its letter to RCG requesting production of material following Buist's deposition in June 2006. (Dkt. #168.) The Court compelled RCG to produce ten categories of documents and materials, including thumb drives (USB keys), and three computers ("the personal Dell laptop," "the IBM ThinkPad," and "the test machine") that Buist had testified that he had used to "recompile" the source code from the zip disks he found in his barn. Id. The Court also ordered a second deposition of Buist. RCG failed to comply with that order. On September 3, 2007, TT moved to show cause. RCG opposed the motion, claiming that it believed all discovery was stayed pending an appeal in the related eSpeed case. On July 17, 2008, the Court once again gave RCG the benefit of the doubt and denied TT's motion to show cause. (Dkt. #227.) Instead of issuing further sanctions, the Court directed RCG to produce the materials outlined in the Court's May 16, 2007, order within 14 days and to set a mutually agreeable date for Walter Buist's deposition. Id.

RCG produced the personal Dell laptop ("declaration machine")[3] and all the zip disks for inspection within the 14-day period. On August 8, 2008, RCG produced the USB thumb drives, the personal Dell, and IBM ThinkPad for imaging by TT's designated forensic company, Impact Forensics ("Impact"). RCG still had not produced the "test machine." By agreement, Impact

---

[3] Buist defined the "declaration machine" in his first deposition as the Dell laptop purchased to compile the code. (Buist Dep. I, June 23, 2006, p. 49:1-13, Dkt. # 306-8.)

held the images in escrow and provided file listings from which TT could request particular files from RCG. Due to the numerous objections made by RCG to TT's requests for files, TT again sought the Court's assistance to obtain full images of the devices. On November 6, 2008, Judge Milton Shadur, substituting for Judge Moran, ordered RCG to produce the images to TT in their entirety on an "Attorneys-Eyes-Only" basis under a protective order. RCG still had not provided the test machine or an agreeable date for Buist's second deposition. On March 3, 2009, Judge Amy St. Eve, substituting for Judge Moran, ordered that Buist be produced for a second deposition by April 17, 2009. Buist was finally produced for a second deposition on June 11, 2009.

At his second deposition, on June 11, 2009, Buist admitted that he had, in fact, turned back the clock on his computer when he was overwriting the source code on the zip disks with modified code, to make it appear that the files on the zip disks had last modified dates in 1998 and 1999 when, in fact, the actual last modified date should have been 2006. (Buist Dep. II, June 11, 2009, 36:5-38:2, Dkt. #306-14.) For one zip disk, Buist changed the clock to November 1998, for another he changed the date to February 1999, and for another he changed the date to April 1999. Id. at 37:12-19, 39:10-17, 40:11-41:10. Notably, Buist testified that he knew that if he changed the date back no one would be able to tell that the files had been modified in 2006. Id. at 42:21-43:6.

TT's computer forensic analyst, David Klausner, stated that there was no valid technical reason for Buist to change the last modified dates. (Klausner Decl., Dkt. # 306-15, at ¶ 14.) According to Klausner, a forensic analyst likely would first look at the original source of the files, i.e., the original zip disks as shown in Exhibit F of Buist's Declaration. Id. at ¶ 8. An analyst would find that the original four zip disks all had dates consistent with Buist's testimony

because they were all dated 1998 and 1999. Id. at ¶ 10. Once the analyst located the original source code, he would compare that code to the code used to generate the videos of the Wit DSM (the files in the "wit directories" on the declaration laptop also cited in RCG's summary judgment motion) to ensure that there were no relevant differences. Id. at ¶ 13. Klausner indicated that a comparison of these two sets of files would lead him to conclude that "no changes would be found in the order entry methods between the two versions of these source code files." Id.

While the Wit DSM directories include a handful of last modified dates of 2006, Klausner stated that one would likely assume that those files with 2006 dates reflect the few changes that were necessary to recompile the code and be able to run it on current systems. Id. None of the files dated 2006 contained different order entry functionality from the "double-click +" that RCG claimed was in the original code. Id. From Klausner's perspective, if TT's analyst conducted a normal comparison of the files that appeared to be relevant, TT may not have discovered the code modifications because the code on the zip disks had every indication of being the original source code. Buist's Declaration and RCG's motion for summary judgment gave no indication that the code had been modified. (Dkt. # 62.)

In addition to revealing that the last modified dates on the source code files had been changed, the discovery conducted since the 2007 sanctions order also revealed that the various disks, USB drives and computers that RCG finally produced had been "wiped."[4] It is undisputed that the additional discovery has shown that all seven of the zip disks cited by RCG in its summary judgment motion were wiped. TT's forensic expert discovered the wiping because the

_____

[4] "Wiped" files are not recoverable even by specialists and wiping requires special commercially available software tools as opposed to merely deleting files by putting them in the recycle bin. See Klausner Decl., Dkt. # 306-15, at ¶ 18.

wiping tools leave behind a "fingerprint" that may be detected by certain forensic tools.

(Klausner Decl., Dkt. # 306-15, at ¶ 21.) At his second deposition, Buist admitted that he used a

wiping program and that the purpose of his wiping was "[t]o make sure that any files on there

were not recoverable other than the ones that I put on there." (Dkt. # 306-14, Buist Dep. II at 95.)

At oral argument on the present motion for default and sanctions, counsel for RCG asserted that

Buist is a very private person and that he wiped the disks because they also contained personal

files that he did not want disclosed, such as his wife's tax return. By overwriting the code that

had been there when he allegedly found the disks in his barn and then wiping them with BC

Wipe or Cyberscrub, Buist insured that no one would be able to know what was actually on

those zip disks that he found. The zip disks were thus put forth by RCG as containing "a copy of

the DSM source code modules that were on [Buist's] computer on or about November 3, 1998."

Indeed, the zip disks were then consistent with RCG's position that the code on the disks

contained the double-click + functionality, last modified in 1998/1999, with the only inconsistent

files being those that were necessary to compile the code on contemporary computers.

B.      *TT's Second Motion for Default and Sanctions*

        Based on the revelations that occurred during the additional discovery, on September 4,

2009, TT filed the current motion for default and sanctions. [Dkt. # 308.] In the present motion,

TT moves for entry of default judgment and monetary sanctions against RCG and its counsel,

pursuant to this Court's inherent powers, Federal Rule of Civil Procedure 37, and 28 U.S.C. §

1927. TT argues that in light of the newly discovered misconduct, monetary sanctions alone are

insufficient. TT alleges the following misconduct:

        (1) Buist altered the last modified dates for the source code files that he copied onto the

                zip disks he found in his barn, effectively back-dating the code to before the critical

dates of the patents-in-suit.

(2) The seven zip disks were wiped prior to RCG producing them for inspection and imaging.  The last disk was wiped 90 minutes before TT arrived at RCG's counsel's office on May 2, 2006, to inspect the disk.

(3) The IBM ThinkPad was reformatted and its operating system reinstalled on June 4, 2008.

(4) The three USB thumb drives Buist produced were wiped on August 5, 2008.

(5) RCG's counsel failed to inform Buist that he was to preserve or produce the "test machine," and claimed to have never heard of the "test machine" until Buist's second deposition in June 2009, despite it having been referred to in Buist's first deposition and the Court's discovery orders, following the first order on sanctions in March 2007.  When the "test machine" was finally produced, it had a hard drive that was manufactured in April 2008.

RCG responds that neither RCG nor its counsel knew of Walter Buist's actions. (Dkt. # 318.) RCG argues that it should not be faulted for Buist's actions because it did not know what he was doing and RCG instructed him "to preserve all media."  RCG also contends that it has already been severely penalized by the loss of the evidentiary value of the information that Buist had.  RCG states in its response that it and "its counsel will not defend Mr. Buist's conduct and have ceased all communication with him." Id. at 3.  RCG further asserts that, had it known what Buist had done, "the summary judgment motion would never have been filed and RCG would have taken all appropriate steps to ensure that Mr. Buist's tainted information not be used to tarnish the integrity of the Court." Id.  RCG claims it and its counsel acted reasonably in their dealings with Buist.

This Court requested oral arguments to address the particular issues of a timeline of events and the additional discovery as well as an explanation of the nature of the relationship between RCG and Walter Buist. The hearing was held on January 7, 2011. Two additional declarations of Walter Buist were tendered to the Court, dated January 6 and January 7, 2011. RCG tendered a declaration from its forensic specialist, Wolfgang Wilke. Following the hearing, RCG requested leave to submit additional newly obtained evidence. This Court granted the motion and allowed TT to respond. The "newly obtained evidence" consisted of a draft of the January 6, 2011, declaration of Walter Buist that TT tendered to the Court at the hearing, which RCG obtained from Buist.

This Court has considered all of the submissions and arguments in rendering its decision. RCG has not produced any evidence to refute the allegations and evidence presented by TT in its second motion for default and sanctions. RCG's response at oral argument was essentially comprised of counsel for RCG, Geoffrey Baker and his co-counsel, Dr. Stephen Lesavich, disavowing any *personal* wrongdoing and any *actual knowledge* of any wrongdoing, while unequivocally distancing themselves and RCG from Walter Buist. It is undisputed that the dates were changed on the source code files and that the media was wiped. The timeline of the wiping of the zip disks that was presented by TT on the present motion shows an even more unsettling problem with the disks than simply the modifications to the code. The handling of all the material sought in discovery after Judge Moran entered the first order sanctioning RCG, paints a very troubling picture.

## II.     Legal Standard

In this motion for default and monetary sanctions, TT requests that this Court enter a default judgment against RCG, in addition to imposing monetary sanctions both on RCG as a

party and counsel for RCG for the representations they made to the Court as officers of the court.

The judicial system is premised on the honest, good faith efforts of the parties involved. See Quela v. Payco-Gen. Am. Credits, Inc., 2000 WL 1308629, at *8-11 (N.D. Ill. May 18, 2006). Where honesty is replaced with falsehood, a party's right to litigate comes into question. Id.; see also Krumwiede v. Brighton Assocs., LLC, 2006 WL 1308629, at *8-11 (N.D. Ill. May 8, 2006). The Seventh Circuit has stated that "[l]awyers and litigants who decide they will play by the rules of their own invention will find that the game cannot be won." Nw. Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 663 (7th Cir. 1994). Here, this Court is presented with the submission of false and misleading statements accompanied by altered and destroyed evidence that appears deliberately aimed at invalidating TT's patents.

The Seventh Circuit has held that, when imposing sanctions, "the penalty must be proportionate to the wrong." Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Ams. LLC, 516 F.3d 623, 626 (7th Cir. 2008); Collins v. Illinois, 554 F.3d 693, 698 (7th Cir. 2009)(per curiam). The Court has the power to enter a default judgment under its inherent powers. Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (citing Link v. Wabash R.R. Co., 370 U.S. 626, 630–31 (1962)); see also Salmeron v. Enter. Recovery Sys., 579 F.3d 787, 793 (7th Cir. 2009). Default judgment is appropriate where a lesser sanction under the circumstances would unfairly minimize the seriousness of the misconduct and fail to sufficiently deter such misconduct by others in the future. See REP MCR Realty,L.L.C. v. Lynch, 363 F.Supp.2d 984, 997-98 (N.D. Ill. 2005). Lesser remedies have "little punitive or deterrent effect for obstructive discovery tactics or perjury… Litigants would infer [that] they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues." Dotson v. Bravo, 202 F.R.D. 559, 575-76 (N.D. Ill. 2001), aff'd, 321 F.3d 663 (7th Cir.

2003)(internal citations omitted). Litigants cannot be permitted to say "'oops, you've caught me,' and thereafter be allowed to continue to play the game…." Id. at 573.

The standard used in this circuit to support outright dismissal appears to have shifted over the course of the pendency of this case. In Maynard v. Nygren, the Seventh Circuit held that a court must have "clear and convincing evidence of willfulness, bad faith or fault before dismissing a case." 332 F.3d 462, 468 (7th Cir. 2003); see also Grogan v. Garner, 498 U.S. 279 (1991); Herman & MacLean v. Huddleston, 459 U.S. 375 (1983). More recently, the Seventh Circuit suggested that the proper standard is the "preponderance of the evidence." See Ridge Chrysler Jeep, LLC, 516 F.3d at 625 (stating that although a Seventh Circuit case used the "clear and convincing" standard, that case failed to discuss Supreme Court precedents that "hold that heightened burdens of proof do not apply in civil cases unless a statute or the Constitution so requires"). As set forth below, this Court finds that TT has met its burden under either standard.

This Court is mindful that the sanction of dismissing a case with prejudice is extreme and "must be infrequently resorted to by district courts." Schilling v. Walworth County Park and Planning Commission, 805 F.2d 272, 275 (7th Cir. 1986); see also United States v. Golden Elevator, Inc., 27 F.3d 301, 303 (7th Cir. 1994). With this admonition in mind, this Court has carefully reviewed all of the parties' submissions on this motion, heard oral arguments, and examined the additional material submitted after the hearing. This Court recognizes the harshness of this sanction, and has considered the entire record of this matter to determine whether such "contumacious conduct" existed and "whether less drastic sanctions have proven unavailing." See Webber v. Eye Corp., 721 F.2d 1067, 1069 (7th Cir. 1983). When discovery non-compliance is coupled with presenting false information to both an adversary and the Court in order to gain an advantage in the litigation, the Court is justified in imposing the ultimate

sanction to preserve the integrity of the federal judicial system. See Ridge Chrysler Jeep, LLC, 516 F.3d at 626-27.

The Seventh Circuit has characterized the type of conduct that warrants outright dismissal as "bad faith" or "conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order." Marrocco v. Gen. Motors Corp., 966 F.2d 220, 224 (7th Cir. 1992). Dismissal is also warranted if there is evidence of willful abuse of the judicial process or fault. See Maynard v. Nygren, 332 F.3d 462, 470-71 (7th Cir. 2003). The Court may presume bad faith where a litigant creates false evidence or testimony. Quela, 2000 WL 656681, at *8. "[C]onsistent disregard for the rules of discovery and court orders meets the Seventh Circuit's requirements for bad faith." Woods v. Chi. Transit Auth., 2006 WL 2460618, at *3 (N.D. Ill. Aug. 18, 2006). "Wilfullness may be inferred from circumstantial evidence." Maynard, 372 F.3d at 892. Fault refers to the reasonableness of the conduct that culminated in the violation. See Marrocco, 966 F.2d at 224. Indeed, fault exists even upon showings of "'extraordinarily poor judgment,' 'gross negligence,' or 'reckless disregard of a party's obligation.'" Porche v. Oden, 2009 WL 500622, at *7-8 (N.D. Ill. Feb. 27, 2009); Woods, 2006 WL 2460618, at *3 (stating that "fault" means a party has acted unreasonably).

A party's failure to preserve evidence alone constitutes bad faith, the additional destruction of evidence is beyond sufficient to warrant a default judgment against that party. See Grochocinski v. Schlossberg, 402 B.R. 825, 842-43 (N.D. Ill. 2009); Monsanto Co. v. Ralph, 382 F.3d 1374, 1382-84 (Fed. Cir. 2004). A default judgment sanction may be imposed regardless of whether the aggrieved party has been harmed. See Monsanto, 382 F.3d at 1382.

## III.    Discussion

After Judge Moran issued the first order sanctioning RCG in March 2007, he ordered

additional discovery and the production of 10 categories of material as well as a second deposition of Buist. As RCG rightly points out, it has already been sanctioned for its misconduct that led to the Court's order on March 14, 2007. This Court therefore focuses its discussion on the events since that order.

RCG does not dispute any of the new allegations of misconduct. Instead, it seeks to distance itself from its own agent, employed for the purposes of pursuing this litigation, and rely on denials of any actual knowledge of wrongdoing as well as personal disavowals of misconduct by counsel for RCG. In contrast, the record reveals a pattern of blurring of facts, the presenting of misleading and false statements to the Court, failure to comply with discovery orders, failure to preserve evidence, and, finally, destruction of material evidence.

First, this Court will briefly review the timeline of discovery following Judge Moran's sanction order on March 14, 2007. After Buist's first deposition on June 23, 2006, TT sought production of the seven zip disks RCG cited in its summary judgment motion, the USB keys or thumb drives that Buist referred to in his testimony, and several computers, including a personal Dell laptop, the IBM ThinkPad, and the "test machine." RCG failed to produce the material and TT sought the Court's assistance. On May 16, 2007, the Court granted TT's first motion to compel and ordered RCG to produce the material sought by TT and to produce Buist for a second deposition. [Dkt. # 168.] RCG still did not produce the material sought and did not provide a date for the Buist deposition. Thereafter, TT filed a motion for rule to show cause why RCG should not be held in contempt for failing to comply with the May 16, 2007, order. Although, on July 17, 2008, Judge Moran declined to hold RCG in contempt, he ordered RCG to produce the material and set a mutually agreeable date for Buist's deposition within 14 days. [Dkt. # 227.] On July 30, 2008, RCG produced the zip disks for inspection. On August 8, 2008,

RCG produced the personal Dell laptop, the USB keys/thumb drives, and the ThinkPad. On November 6, 2008, Judge Shadur ordered RCG to produce complete forensic images. [Dkt. # 250.] On March 3, 2009, Judge St. Eve ordered RCG to present Buist for a second deposition by April 17, 2009. [Dkt. # 270.] After an extension, Buist was finally presented for a second deposition on June 11, 2009 – three years after his first deposition in this case and over two years after the second deposition was ordered. On July 28, 2009, the "test machine" was finally produced, but the hard drive had been replaced with one manufactured in April 2008. Even if this Court accepts that RCG believed all discovery was stayed pending the resolution of the eSpeed case, there was no excuse for the noncompliance after July 17, 2008, when Judge Moran ordered the material produced within 14 days. Yet, it took two additional court orders by two separate judges, and another year before RCG had produced the media and deposition ordered by the court in May 2007.

In March 2007, when the Court sanctioned RCG for misleading the Court in its summary judgment motion by failing to inform anyone that the source code it was presenting as original prior art from 1998/1999 had been modified, TT had already begun to suspect that the dates associated with that code had also been modified. The additional discovery revealed something more troubling: not only had the dates on the code been "turned back" to appear as though the code had been last modified in 1998/1999, but that zip disks, that purportedly contained the source code for the Wit DSM had been wiped and that the other media, ordered by the Court to be produced, had also been wiped and the hard drive of the "test machine" replaced. At best, this demonstrates a failure to preserve evidence. At worst, it is the intentional destruction of evidence and the fabrication of prior art in a deliberate attempt to deceive this Court and invalidate TT's patents. RCG offered virtually nothing but semantics and denials in rebuttal of

the evidence presented by TT, lending credence to a conclusion that the latter scenario is more plausible.

A.      *Turning Back the Clock*

RCG was on notice as early as 2006 that TT suspected that the dates on the code had also been changed.  On June 23, 2006, Buist admitted he modified the code and overwrote it in 2006. RCG *should have known* that Buist had altered the last modified dates on the zip disks because, instead of showing 2006 last modified dates for the altered files, all of the files on the original zip disks have 1998/1999 last modified dates. A simple review of the file directories shows the last modified dates listed as 1998 and 1999 instead of 2006.[5]  In the face of this evidence, RCG continued to deny the allegations that the dates had been changed.  Through its denials, RCG articulated the gravity of the allegations characterizing them as "libelous," "audacious," and an "Oliver Stone-esque" conspiracy theory.  (See Dkt. #204 at 2-3.)  The denial is itself problematic because simply questioning Buist, RCG's own consultant, would have revealed that the last modified dates had indeed been changed as Buist testified in his second deposition.  RCG and its counsel had an affirmative duty to make sure that the metadata was accurate in light of their reliance on the source code contained on the zip disks. <u>See</u> Fed. R. Civ. P. 26. Instead of inquiring further into the matter, RCG opted to stay the course and continue to deny any wrongdoing.  Now, RCG claims that had it known, RCG would have immediately stopped all contact with Buist and would have withdrawn its motion for summary judgment. (Dkt. # 318, at 3.)  At present, RCG may have stopped contact with Buist, but the denial continues.

---

[5] The file directories are viewable by looking file listings on the zip disks using common tools available on every computer.  TT attached printouts of the directories as Exhibit GG to its reply brief. (Dkt.# 320.)

B.    *Wiping the Media*

RCG does not dispute that the disks were wiped, however it disputes that Buist did not wipe the seventh disk.  Buist admitted that he wiped six of the seven zip disks that were produced by RCG as purportedly containing the original source code of the Wit DSM that would invalidate TT's patents. The seventh disk was wiped on May 2, 2006, according to TT's forensic analysis of the fingerprints left by the wiping tools.  Buist asserted that he had no control over the disks after April 26, 2006, the date of RCG's summary judgment motion.  The declaration of Stephen Lesavich[6] was offered in support of RCG's response in opposition to the present sanctions motion. (Dkt. # 318.) In that declaration, Lesavich stated that "[t]he only time [he] ever interacted with Mr. Buist was in Albany, New York on or about April 25, 2006, and again in [his] office on or about May 2, 2006." (Lesavich Decl., Dkt. # 318-2, ¶ 24.)  Lesavich further declared that: "*After* May 2, 2006, [he] had no further physical contact with any media or device used by Mr. Buist or by RCG in this matter." Id. at ¶ 38.  Buist's invoices to RCG end on April 26, 2006, and do not reflect that he was in Chicago on May 2, 2006.[7]  At oral argument, Attorney Baker first stated that he did not wipe the disk on May 2, 2006, and then asserted that Dr. Lesavich could not have wiped the seventh zip disk because "he was out of the state" on that date.  Lesavich was present at counsel table when Attorney Baker made this assertion.  Despite the blatant contradiction with his sworn declaration, Lesavich remained silent as his co-counsel claimed that Lesavich was out-of-state on May 2, 2006.

Coincidentally, May 2, 2006, was the date that the parties agreed that TT would inspect

---

[6] Stephen Lesavich is one of the attorneys representing RCG in this matter. (Lesavich Decl. Dkt. # 318-2, ¶ 1.) Prior to attending law school he was a software engineer with a Ph.D. in computer science. Id. at ¶¶ 4-6.

[7] The invoice was prepared in June 2006 and thus presumably would reflect a May 2 trip to Chicago had there been one. (Dkt. # 306-23.)

the evidence at Dr. Lesavich's Chicago office at 11:00 a.m.  On May 2, 2006, at 9:59 a.m., Attorney Baker sent an e-mail to TT advising that the inspection needed to be pushed back half an hour to 11:30 a.m.  TT did not object to the rescheduling.  Instead, TT notified Attorney Baker at 10:41 a.m. that counsel for TT would come by after lunch around 1:00 p.m.  As forensic analysis later revealed, on May 2, 2006, between 11:28 a.m. and 11:50 a.m., the "9903-2" zip disk one of the pieces of evidence that was to be inspected on that date, was wiped with BCWipe. (Klausner Decl., Dkt. # 306-15, ¶ 20.) This Court further notes that RCG's counsel relied on the May 2006 inspection in sworn declarations to the Court to argue that they acted in good faith. (Dkt. # 107, Baker Decl. ¶ 21, October 5, 2006; Dkt.# 107, Lesavich Decl. ¶ 19, October 5, 2006.)  RCG's response brief does not address the May 2, 2006, wiping, and at oral argument counsel stated that *he* did not do any wiping.  Despite never disputing that the wiping took place and that the disks were within RCG's control, RCG never provided an answer as to who did the wiping.  If not Walter Buist, not Attorney Baker, not Dr. Lesavich, then who?

Despite the Court's inclination to take an officer of the Court at his word, a thorough review of all the evidence supports an opposite finding.  This Court finds it impossible to believe that it is merely coincidence that the seventh disk happened to be wiped on May 2, 2006, which just happened to be the same day that TT was scheduled to inspect it. "The prevailing rule [in this circuit] is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction." Crabtree v. Nat'l Steel Corp., 261 F.3d 715, 721 (7th Cir. Ill. 2001) (quoting Coates v. Johnson & Johnson, 756 F.2d 524, 551 (7th Cir. 1985)); see also Partington v. Broyhill Furniture Indus., Inc., 999 F.2d 269, 272 (7th Cir. 1993) ("If, being sensitive to the possibility of a suit, a company then destroys the very files that would be

expected to contain the evidence most relevant to such a suit, the inference arises that it has purged incriminating evidence.").

TT's contention that, virtually every piece of media ordered produced by the Court in May 2007 and July 2008 was wiped, altered, or destroyed *after* those orders were entered, is supported by forensic analysis. The personal Dell laptop that was finally produced for imaging on August 8, 2008, shows that on August 5, 2008, files were wiped. (Klausner Decl. Dkt. # 306-15, ¶ 24.) The "recycle bin" on the personal Dell was purged on August 6, 2008. Id. Independent of the forensic evidence, Buist admitted wiping the personal Dell laptop. (Dkt. # 306-14, 94:21-95:1.)

The IBM ThinkPad, which was ordered produced in May 2007 and again in July 2008, was finally produced for imaging on August 8, 2008, but had been reformatted with a new operating system installed on June 4, 2008. (Klausner Decl. Dkt. # 306-15, ¶ 25.) Reformatting a hard drive eliminates the names of existing files and causes the space occupied by those files to become free space. That free space is likely overwritten by the installation of the new operating system. Id. Thus, any files on the ThinkPad that may have been relevant to discovery in this litigation were likely rendered unrecoverable. See Id. When TT imaged the machine and analyzed its contents, it found nothing of relevance, despite the fact that the ThinkPad was one of the primary portals through which Buist compiled the Wit DSM code. Id.

The Court had also ordered RCG to produce any USB thumb drives Buist used in transferring the Wit DSM between the various machines he was using to recompile the code. All three thumb drives that RCG produced likewise had been wiped on August 5, 2008, three days before they were produced to TT. RCG and Buist were aware that the USB thumb drives were evidence and that RCG was obligated to preserve and produce them to TT for inspection.

Counsel for TT even asked Buist during his first deposition in June 2006 to preserve those USB drives. (Buist Dep. I, Dkt. # 306-8, p. 76:2-6.)

The "test machine" was the computer that Buist first used to load the Wit DSM code from the four zip disks that he allegedly found in his barn. (Buist Dep. I, Dkt. # 306-8, p. 51-53.) RCG's representations to the Court regarding the "test machine" are particularly unsettling. RCG now claims that it "reasonably believed that the test machine had already been produced." (Resp. Dkt. #318, at 7.) Yet, at Buist's second deposition in June 2009, Attorney Baker denied knowing of the existence of the "test machine" until that moment. (Buist Dep. II at 152.) RCG asserts both these arguments in spite of the Court's two orders requiring production of the "test machine," and TT's repeated requests for it.[8] (Dkt. # 168, # 225.) RCG further argues that "the first that RCG's counsel learned that [the test machine] even had this 'conduit' role was on June 11, 2009, at the that Mr. Buist testified for a second time." (Resp. Dkt. #318, at 7.) However, it was Attorney Baker that defended Buist's first deposition, throughout which Buist referred to the "test machine," (see, e.g., Buist Dep. I 58:6-7; Buist Decl. II¶ 27, September 29, 2006, Dkt. # 107.) On July 28, 2009, RCG produced the test machine for inspection. TT imaged the hard drive that RCG produced and found that it was not manufactured until April 4, 2008. (Klausner

---

[8] TT contacted RCG via letter and e-mail several times in 2008 and 2009 to inquire about the test machine. (See, e.g., Kurcz email to Baker, October 30, 2008: "TT requests that you make the fourth computer, i.e., the "test machine," available for imaging and review immediately"; Kurcz email to Baker, October 31, 2008: "What are you representing about RCG's production with respect to category (7) (the test machine) of the Judge's 5/16/07 order? Is it RCG's position that such a machine does not exist?"; Kurcz letter to Baker, May 28, 2009: "we have repeatedly requested that you produce the test machine, as ordered by the Court.") (Dkt. # 306-27.)

In response to TT's inquiries about the test machine, RCG claimed that "all physical objects have been produced." (Baker email to Kurcz, October 30, 2008; see also Baker email to Kurcz, October 31, 2008: "The cite you provide [to Buist's reference to the test machine in his deposition] does not lead to the conclusion you propose. Again, we have produced all of the physical objects.") Id.

Decl. Dkt. # 306-15, ¶28.)  TT claims that the hard drive from the 2006 test machine referenced by Buist still has not been produced.

Now, RCG's defense is its claim that it had no actual knowledge of any of the misconduct and that it should not be held responsible for the actions of its consultant Buist. RCG claims that it had no reason to doubt Buist's information because he was a non-party and his information "appeared to be what he said [it was]." (Resp. Dkt. #318 at 5.)  The imposition of sanctions, however, does not require *actual knowledge*, but gross negligence or recklessness, i.e., RCG knew or *should have known*. See Porche v. Oden, 2009 WL 500622, at *7 (N.D. Ill. Feb. 27, 2009).  Even if this Court were to accept that RCG had no actual knowledge of the evidence destruction and modification that occurred, RCG's conduct still warrants the imposition of a default judgment.  See, e.g., Grochicinski v. Schlossberg, 402 B.R. 825, 842-43 (N.D. Ill. 2009) (finding bad faith sufficient to impose default judgment because "[e]ven if Schlossberg did not destroy the files himself, the bankruptcy court found that at the very least Schlossberg acted in 'reckless disregard' of his discovery obligations").

Even if RCG and its counsel had no actual knowledge of the spoliation, the wiping and reformatting of the thumb drives and the computers might have been avoided if RCG had promptly complied with Court's orders to produce the material.  At minimum, RCG and its counsel had a duty to preserve the evidence, which they could have done by taking physical possession of, or obtaining forensic images, of the evidence.  It appears that RCG took no steps after the first order to collect the evidence to ensure its preservation. See Cyntegra, Inc. v. Idexx Labs., Inc., 2007 WL 5193736, at *5 (C.D. Cal. Sept. 21, 2007) ("[C]ourts have extended the affirmative duty to preserve evidence to instances when that evidence is not directly within the party's custody or control so long as the party has access to, or indirect control over, such

evidence.")  Parties to a lawsuit have a duty to preserve admissible evidence as well as evidence that is discoverable because it is "reasonably calculated to lead to the discovery of admissible evidence." Wiginton v. CB Richard Ellis, No. 02 C 6832, 2003 WL 22439865 at *4 (N.D. Ill. Oct 27, 2003); Fed. R. Civ. P. 26(b)(1).  RCG claims that it told Buist, a non-lawyer, several times to preserve everything related to the Wit DSM.  However, it is evident to this Court, and should have been equally apparent to counsel for RCG, who actually interacted with Buist, that Buist's understanding of what "preserve" means was dramatically different from what is intended by that word for litigation purposes.  Moreover, simply telling Buist to preserve everything related to the Wit DSM, does not strike this Court as a reasonable means of ensuring preservation of evidence material to this lawsuit, especially after the Court had specifically ordered certain pieces of equipment to be produced.  Nor does it explain RCG's failure to comply with discovery orders by producing the media in a timely manner.

C.      *RCG's Relationship with Walter Buist*

RCG adamantly disavows all responsibility for the actions of Walter Buist, repeatedly referring to him as a "non-party fact witness."  While it may be true that Buist is not personally a party to this lawsuit, RCG did intend to use him as a fact witness.  RCG also retained Buist as a consultant hired to "reconstruct" the Wit DSM code. (See Dkt. #318, at 4.)  Thus, it strains credulity that RCG now claims it had no knowledge of anything Buist was doing and he was just a "non-party fact witness" for whom it bears no responsibility.

On the contrary, the record reflects Buist was under RCG's control and was its paid agent.  An agency relationship arises when a principal "manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control…".  RESTATEMENT (THIRD) OF AGENCY § 1.01; see also Del Amora v. Metro Ford Sales

& Servs., Inc., 206 F.Supp.2d 947, 951-52 (N.D. Ill. 2002).

Buist entered a consulting agreement with RCG on July 6, 2005. Buist spent nearly 300 hours working for RCG. (Invoice, Dkt. # 306-23). In addition to the time Buist spent working on the code, the invoice sent to RCG reflects time billed for meetings; 6 hours on February 6 [2006] in Cherry Valley, New York; 12 hours on March 12 [2006] in New York City; 16 hours on April 13-14 [2006] in Chicago; 16 hours on April 17-18 [2006] in Chicago; and 14 hours on April 26[9] [2006] in Albany. Id. Buist was compensated at an hourly rate of $120, and he sent his invoices to Gerald Fishman, RCG's Senior VP and in-house attorney. RCG paid Buist $36,560.00 for his time. Id. RCG also provided Buist with attorney representation. Buist testified at the 2009 deposition that Attorney Baker "looks out for my interests… relating to this case." (Buist Dep. II, Dkt. # 306-14, at 111-13.) Buist testified that he wiped the disks in Chicago at RCG's counsel's offices, and that RCG's trial counsel's firm, Dowell Baker, provided the zip drive that he used to wipe the disks. Id. at 80:16-81:6, 83:3-84:15. Consistent with that testimony, a comparison of Buist's invoice to the dates when the zip disks were wiped confirms that Buist was meeting with RCG's attorneys in Chicago on April 13-14, 2006, and April 17-18, 2006, when six of the seven disks were wiped. RCG then adopted Buist's work and filed a summary judgment motion based on the modified source code. RCG also worked with Buist to craft the language of his declaration that RCG relied on in support of its motion for summary judgment.

The Court has compelled RCG to produce items owned by Buist and compelled RCG to produce Buist for deposition. At no time during the proceedings has RCG ever objected,

---

[9] April 26, 2006, is the date that RCG filed its summary judgment motion and the last date that Buist says he had access to the zip disks.

claiming that it did not control Buist or that it could not obtain the evidence because it was not within its control. Indeed, RCG and its counsel continually vouched for Buist and defended his actions to this Court, including in its motion to vacate the first sanctions award, where RCG attempted to justify the modifications to the code. RCG further vouched for Buist when it denied that he had changed the last modified dates on the zip disks. To bind the principal, the agent must have either actual or apparent authority, or the principal must ratify the agent's unauthorized actions. See, e.g., Anetsberger v. Metropolitan Life Insurance Co., 14 F.3d 1226, 1234 (7th Cir. 1994). Even where an agent acts outside his authority, the principal is still bound if it ratifies the behavior by retaining the benefits of an unauthorized transaction or by taking a position consistent with affirmation of the agent's actions. See Progress Printing Corp. v. Jane Byrne Political Committee, 235 Ill. App. 3d 292, 310, 601 N.E.2d 1055, 176 Ill. Dec. 357 (1st Dist. 1992). Instead of immediately addressing the problem, as counsel for RCG now claims it would, RCG engaged in a pattern of denials that any material evidence had been altered. Thus, Buist was acting as an agent of RCG during the relevant time and his actions are properly imputed to RCG. See Lekkas v. Mitsubishi Motors Corp., 2002 WL 31163722, at *4 (N.D. Ill. Sept. 25, 2002) (citing Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 & n.10, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962); Inryco, Inc. v. Metropolitan Eng'g Co., Inc., 708 F.2d 1225, 1233-34 (7th Cir. 1983)) (imputing to the plaintiff an agent's failure to preserve evidence, where the agent received notice that evidence was going to be salvaged and he took no steps to prevent its destruction).

*Default Judgment*

Based on the foregoing, this Court finds clear and convincing evidence that RCG, and its counsel, acted in bad faith and with willful disregard for the rules of discovery and this Court's

orders. Moreover, monetary sanctions alone would be insufficient in this situation, where further misconduct occurred even after RCG had been sanctioned once for discovery abuses. Therefore, this Court finds it appropriate to enter a default judgment in favor of TT and dismiss RCG's complaint with prejudice and strike its defenses to the counterclaim.

*Monetary Sanctions Against RCG and Counsel for RCG*

The Court has inherent power to impose sanctions where necessary to prevent abuses of the judicial process and promote the efficient administration of justice. APC Filtration, Inc. v. Becker, 2007 U.S. Dist. LEXIS 76221, 7-8 (N.D. Ill. Oct. 12, 2007); Barnhill v. U.S., 11 F.3d 1360, 1367 (7th Cir. 1993). This authority includes imposing sanctions on parties for failing to preserve properly discoverable potential evidence. Wiginton, 2003 WL 22439865 at *3 n. 5. Federal Rule of Civil Procedure 37(b)(2) also provides the Court with authority to impose sanctions on a party that "fails to obey an order to provide or permit discovery." In either case, the Court's choice of sanction is discretionary. Langley v. Union Electric Co., 107 F.3d 510, 513 (7th Cir. 1997); Barnhill, 11 F.3d at 1367. The guiding principle is that "[a]n award of sanctions must be proportionate to the circumstances surrounding the failure to comply with discovery." Langley, 107 F.3d at 515 (internal quotations and citations omitted).

Rule 37 provides for sanctions for violations of discovery orders. Fed. R. Civ. P. 37(b). Under Rule 26(g), a court must impose sanctions against the party, its counsel, or both, when the party fails to meet its disclosure obligations under Rule 26. Fed. R. Civ. P. 26(g)(3). The completeness and accuracy of these disclosures must be certified by an attorney of record. Id. at 26(g)(1). This certification requirement includes an obligation to conduct a reasonable inquiry into the disclosures. Id. Sanctions may include the imposition of expenses and attorneys' fees incurred by the opposing party due to the violation. Id. at 26(g)(3).

This Court finds that both RCG and its counsel acted willfully in bad faith by engaging in conduct that resulted in deception of both the opposing party and the Court, the destruction of relevant evidence, the waste of judicial resources, and the undermining of the judicial process.

Therefore, this Court imposes on RCG sanctions in the amount of $1,000,000 for its egregious conduct before the Court. For their part in presenting misleading, false information, materially altered evidence, and willful non-compliance with the Court's orders, counsel for RCG will be required to pay the costs and attorneys fees incurred in litigating this motion.

## IV.     Conclusion

Based on the foregoing, defendant and counterclaimant, Trading Technologies International, Inc.'s motion for default judgment and monetary sanctions based on misconduct by plaintiff and counterclaim defendant, Rosenthal Collins Group, LLC, and its counsel [308] is granted. Default judgment is entered in favor of TT and RCG's complaint is hereby dismissed with prejudice and its defenses stricken. RCG is fined in the amount of $1,000,000 and counsel for RCG will be required to pay the costs and fees incurred in litigating this motion.

IT IS SO ORDERED.

Date: February 23, 2011                    Entered:

_____
Judge Sharon Johnson Coleman